UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

Dean R. Anderson, and Debbi J. Anderson,

                           Plaintiffs,

      vs.

Fibertec, Inc. a/k/a Fibertec Windows &
Doors, Mfg.; Above and Beyond Construction,
Inc.; Arlo Cooker; and E Ship One Inc.,

                        Defendants.

**COMPLAINT
JURY TRIAL DEMANDED**

_____

       Plaintiffs Dr. Dean R. Anderson, and Debbi J. Anderson, by and through their attorneys Parker & Wenner, P.A. and Jordan W. Anderson, and for their Complaint against Defendants state and allege as follows:

## JURISDICTION AND VENUE

      1.    This is civil action seeking damages for violations of the Magnuson-Moss Warranty Act (15 U.S.C. § 2301 *et seq*.), and pendant state law claims, including violations of the Minnesota Uniform Commercial Code, the Minnesota Deceptive Trade Practices Act, Minnesota Consumer Fraud Act, and common law fraud.

      2.    This Court has jurisdiction under 15 U.S.C. § 2301 *et seq*. (Magnuson Moss Warranty Act); 28 U.S.C. § 1331 (federal question); and 28 U.S.C. § 1367 (supplemental jurisdiction).

3.      This Court has personal jurisdiction over non-resident Defendants by virtue of pursuant to Minnesota Statutes § 543.19, subd. 1, and Common Law.

4.      Venue is proper pursuant to 28 U.S.C. § 1391.


## **PARTIES**

5.      Plaintiffs Dr. Dean Anderson and Debbi Anderson (hereinafter, collectively "Andersons"), husband and wife, are individuals residing at 4897 County Road 42 NE, Alexandria, Minnesota.

6.      Defendant Fibertec, Inc., a/k/a Fibertec Windows & Doors, Mfg. (hereinafter "Fibertec"), is a Canadian Corporation, with its principal place of business located at 615 Bowes Road, Unit #1, Vaughan Ontario, Canada.

7.      Defendant Fibertec is a designer and manufacturer of windows.

8.      Defendant Above and Beyond Construction, Inc. (hereinafter "Above and Beyond") is a Minnesota Corporation, active and in good standing, with a registered office address of 481 206th Avenue, NE, East Bethel, Minnesota, 55011, and a principle executive office address of 7601 Washington Avenue, S, Edina, MN 55439-2417.

9.      Defendant Arlo Cooker (hereinafter "Cooker") is a representative of Above and Beyond, and was the personal sales person for Above and Beyond and Fibertec to Plaintiffs.

10.     Defendants Above and Beyond, and Arlo Cooker, were at all times relevant to this litigation, the importers of Fibertec windows for Plaintiffs.

2

11.     Defendant E Ship One Inc (hereinafter "E Ship") is a Canadian Corporation with its principal place of business located at 8837 Mississauga Road, Peel, Ontario L6Y 0C2 Canada.


## FACTS

12.     In the summer of 2010, Andersons began planning to build a residential home on a lake-front property on the north side of Lake L'Homme Dieu located at 4897 County Road 42 NE, Alexandria, Minnesota (hereinafter the "Home").

13.     One of the primary features of the Home that the Andersons designed was the grand, southeast-facing windows overlooking the lake.

14.     The Home was designed so that the majority of the windows would provide scenic views, including a two-story vista at the center of the house with a grand bank of windows facing southeast.

15.     Plaintiffs knew at that time that large windows were going to be one of the most significant features of the Home and needed certain specifications, including good insulation, and the ability to let in solar heat in the winter on the south side of the Home.

16.     With regard to the windows not facing south, Plaintiffs needed only a high level of insulation for the remaining windows.

17.     Construction on the Home initiated in September, 2010, with window research continuing into fall.

18.     In or about the fall of 2010, Plaintiffs attended the Minneapolis Home and Garden Show at the Minneapolis Convention Center, continuing their research into the windows for their Home.

19.     At the Minneapolis Home and Garden Show, Plaintiffs met Defendant Arlo Cooker and Defendant Above and Beyond.

20.     Cooker represented to Plaintiffs that he and his company Above and Beyond were the exclusive distributor in Plaintiffs' area for Fibertec, a manufacturer of high-quality windows.

21.     Cooker gave Plaintiffs glowing reports of the integrity of Fibertec, as a company and as to the quality of their product, and Cooker assured Plaintiffs that Fibertec had been a fantastic company to work with.

22.     Cooker specifically represented to Plaintiffs the high value and quality of Fibertec's fiberglass frames, and the amazing seal and low air infiltration qualities of the Fibertec windows.

23.     Fibertec windows are sold as pre-fabricated glass encased in fiberglass frames.

24.     Cooker pointed Plaintiffs to certain test results of the Fibertec products from the National Fenestration Rating Counsel, from which Cooker claimed that Fibertec windows:

a.   have excellent insulation "U-value" (*i.e.* the "thermal transmittance" which is the rate of transfer of heat through a window divided by the difference in temperature from one side of the window to the other); and,

b.   have the ability to take in radiant solar heat in the winter while blocking the UV rays which causes fading of fabrics, flooring, and rugs inside the Home.

25.   Cooker insisted on the great benefits of triple pane glass rather than the double pane with a membrane between the glass, and instructed Plaintiffs that this was the type of windows they needed to meet their needs.

26.   Cooker also insisted on the "e coatings" that Fibertec had on their window products, explaining how Fibertec puts a special coating on the correct glass surfaces, which was promised to prolong the life and quality of the windows and give great energy effeciency.

27.   Cooker further represented that Fibertec had an excellent reputation when it came to replacement of broken or failed sealed glass units even replacing a unit or two at no charge if they were accidently broken during installation.

28.   Plaintiffs were persuaded that Cooker was extremely knowledgeable when it came to windows and the products available, and relied on his representations, advice, and recommendations.

29.   Plaintiffs completed the design of the Home around the size and support needs of the Fibertec window specifications, and ordered from Cooker and Above and

Beyond the top-of-the-line Fibertec windows, including Argon filled sealed units everywhere in the house except the garage which were double pane argon filled.

30.     Plaintiffs ordered 97 sealed glass units, arranged in 46 separate window openings, of which 67 were fixed windows, and 30 windows were operable.

31.     Plaintiffs never received a written contract or any specific written warranty for the windows, from Above and Beyond, Cooker, or Fibertec.

32.     Plaintiffs gave Cooker a check for the purchase of the Fibertec windows, which Plaintiffs hand delivered to Cooker in Minneapolis, because the order and shipping time was getting tight.

33.     Plaintiffs were only given a paper copy of Above and Beyond's actual order from Fibertec with all the size, e-glass treatments, design and product information on it.

34.     Plaintiffs had seen an online and advertising brochure which stated that Fibertec's products carry a warranty for 20 years.

35.     Plaintiffs also had Cooker's word on the excellence of the windows and the company Fibertec.

36.     Plaintiffs relied on Cooker's assurances, in spite of the considerably higher price, that Plaintiffs were purchasing top quality window units from the best company, Fibertec.

6

37.     Plaintiffs did receive from Cooker a statement from Fibertec which claims Lifetime Warranty, which says "Lifetime Warranty. Every window we produce is inspected before shipping, after all, it must last a lifetime!" (See Exhibit A).

38.     Plaintiffs reasonably relied on this statement, in conjunction with the statements and representations made by Cooker, to mean that their purchase of Fibertec products came with an unlimited lifetime warranty.

39.     The Fibertec window units arrived at the Home and were installed, according to Fibertec's manufacture specifications, in or about the middle of April, 2011.

40.     In November, 2014, just three years after installation, Plaintiffs first noticed in a photograph that the windows appeared to be either cloudy or dirty.

41.     Plaintiffs had the windows professionally cleaned, which improved the visibility.

42.     In September, 2015, Plaintiffs had additional photographs which appeared to show clouding on the windows.

43.     Plaintiffs again had the windows professionally cleaned, and the professional window washer reported after cleaning the windows that several windows did not clean up perfectly, implying a defect in the windows.

44.     In May, 2016, Plaintiffs had additional specific photographs of the windows showing multiple units failing with condensation and clouding between the glass panes.

7

45.    In July, 2016, Plaintiffs had the windows professionally cleaned again and the professional window washer indicated that he was positive that the window units were failing, and demonstrated to Plaintiffs that the clouding and condensation was in fact between the panes of glass.

46.    Dr. Anderson then promptly called Fibertec's customer service to report that his windows were failing, and spoke to a woman who identified herself as "Marcia", and was later identified as Marcia Brooks.

47.    Ms. Brooks asked Dr. Anderson the date of his window order.

48.    When Dr. Anderson stated that the Fibertec windows were purchased in the winter of 2011, Ms. Brooks indicated that Fibertec was already aware of the trouble with the seal failure over a several year period including the time-frame when Andersons bought the windows, and stated that Fibertec had been buying the sealed units from another company which was already out of business.

49.    Dr. Anderson politely but unequivocally represented at that time that he was dissatisfied with the windows and demanded warranty replacements, indicating that he intended to hold Fibertec responsible for all the costs of shipping and labor for replacement.

50.    Ms. Brooks assured Dr. Anderson that Fibertec would "stand behind" the windows that the Andersons had purchased from Fibertec.

51.     Ms. Brooks indicated that replacement windows would be fabricated for the Andersons, but refused to make any representations as to whether Fibertec would absorb the costs of shipping and labor for replacement.

52.     Ms. Brooks also told the Andersons that they needed to do the replacement during a time of the year with temperatures above 50º Fahrenheit, which she indicated might be difficult with fall around the corner, and considering the amount of time it would take to fabricate the replacement windows.

53.     On Ms. Brooks' advice regarding the scheduling, Anderson agreed to remain patient for the fall and to wait to make the repairs until the following spring when temps again go above 50 degrees predictably.

54.     Dr. Anderson also contacted Cooker at Above and Beyond, and learned that Cooker was already aware of several other homes with Fibertec sealed window units in his area that had failed.

55.     Cooker gave Dr. Anderson the contact information for at least two other customers to whom Cooker had sold failing Fibertec window units, and Cooker pledged to do anything he could to help Plaintiffs.

56.     In March, 2017, Andersons discovered that many more units were failing, and that in order to repair the damage he would need to replace all of the windows on the entire Home.

57.     Dr. Anderson again contacted Ms. Brooks at Fibertec to see what could be done to move the project along and replace the failing windows.

58.     In April, 2017, Dr. Anderson personally examined every window in the and found that 96 out of the 97 Fibertec window units installed into his Home had visible evidence of failure, clouding, and/or leakage.

59.     Dr. Anderson sent the list of failed windows to Fibertec's customer service department.

60.     Ms. Brooks eventually set up a phone call for Dr. Anderson with Mr. Zion Knafo, the General Manager of Fibertec.

61.     At this point, for the first time, Mr. Knafo announced to Dr. Anderson that Fibertec would fabricate only new glass, but not new fiberglass encasements, and that Fibertec would charge Anderson $11,800.00 for shipping the new glass to the Home.

62.     Mr. Knafo told Dr. Anderson that Fibertec would cover the fabrication of the glass under the warranty, but that Plaintiffs would be responsible for all costs and expenses related to shipping from the Fibertec factory, which Fibertec would arrange, and the Plaintiffs would have to incur their own costs for installing the new glass.

63.     Mr. Knafo stated that Fibertec's policy is to pay for the shipping and installation of the windows under the warranty only if a customer exercised the warranty within 2 years of delivery.

64.     Upon information and belief, Fibertec was already aware of the failure of Andersons' windows, and of all the other windows fabricated and sold by Fibertec at that time, within the 2-year time frame, and concealed the same from the Plaintiffs.

10

65.     Upon information and belief, Above and Beyond was already aware of the failure of Andersons' windows, and of all the other windows fabricated and sold by Fibertec at that time, within the 2-year time frame, and concealed the same from the Plaintiffs.

66.     Upon information and belief, Fibertec was aware of the seal failure issue in that "several year time period", as stated by Ms. Brooks in Fibertec's customer service department.

67.     Upon information and belief, Fibertec may have been aware of the problem even at the time it delivered Plaintiffs their windows.

68.     On July 11, 2017, for the first time, Cooker emailed to Dr. Anderson a photograph of the Fibertec "Limited Lifetime Warranty" which he had received on Plaintiff's behalf in or about February, 2011. (See Exhibit B).

69.     Prior to receiving this email from Cooker on July 11, 2017, Plaintiffs had never been provided any documentation from Fibertec, Above and Beyond, Cooker, or from any other source which purported to limit the terms of the warranty.

70.     Based on Fibertec's position as communicated to Dr. Anderson by Mr. Knafo, and because Plaintiffs wanted the windows replaced on the Home by the end of the summer, Dr. Anderson sought out bids for an installer and got an estimate by July, 2017, and notified Fibertec to send the replacement windows.

71.     The estimate of the total bill for the installer to remove the old glass from the fiberglass encasements and replace it with the new glass from Fibertec came to approximately $35,000, which included man-lift rental, scaffolding, labor and materials.

72.     In July, 2017, Fibertec notified Dr. Anderson that it would take 4-6 weeks to accomplish delivery of the new glass, placing the anticipated delivery date in early to mid-August, 2017.

73.     By mid-August, 2017, the replacement glass had not yet arrived.

74.     Plaintiffs called Fibertec frequently from the end of August through September, 2017, inquiring about the delivery of the replacement glass.

75.     Plaintiffs were told by Fibertec that the delivery date was put off, time and again, because the company was moving or had other issues in timely fabricating the replacement glass.

76.     Fibertec had maintained that the replacement must be done during a time of the year with temperatures above 50º Fahrenheit, and as the fall wore on and the delivery was pushed back by Fibertec, Plaintiff realized that the weather was not going to accommodate installation in 2017.

77.     In early October, 2017, Fibertec notified Plaintiffs that Fibertec was ready to ship the replacement glass.

78.     At that time, the weather predictions were unfavorable and the weather would not accommodate installation that fall.

79.     On this information, Plaintiffs notified Fibertec to wait until spring of 2018 to arrange the delivery.

80.     Dr. Anderson later learned that the windows were in fact not ready to deliver until December 21, 2017, according to Fibertec notification.

81.     At that time, Dr. Anderson also notified Fibertec that because of the failed windows, Plaintiffs had noticed a marked reduction in insulation performance in the preceding several years, and that Plaintiffs would see another extra heating utility expense over the winter of 2018 because of the delay.

82.     On December 21, 2017, Fibertec notified Dr. Anderson that Fibertec intended to charge Plaintiffs $125 per week for storage of the replacement glass until it was shipped to Plaintiffs, even though they had failed to deliver on the agreed upon schedule in the previous summer and fall.

83.     On January 25, 2018, Ms. Brooks emailed Dr. Anderson that Mr. Knafo intended to run Dr. Anderson's credit card for a "deposit of 50% on the units to secure them for you."

84.     Before Dr. Anderson could even respond, Fibertec ran Dr. Anderson's credit card on February 1, 2018, for $5,900, without his permission.

85.     On February 8, 2018, Dr. Anderson politely demanded that Fibertec refund the unauthorized credit card payment, and demanded an explanation for why he was being charged by Fibertec for their warranty work.

86.    On February 16, 2018, having received no response from his previous email, Dr. Anderson again emailed Fibertec, demanding an explanation for the charge, demanding that the charge be refunded, and an explanation of Fibertec's intentions regarding the warranty on the failed windows.

87.    That day, Fibertec responded that "Fibertec is the one who has and will contract the transport company(ies) and the bond & brokerage, etc. to ensure your shipment arrives safe and sound in a timely manner. […] The fees given are for the packaging, handling, bond and brokerage, and freight charges for the units and is payable to Fibertec."

88.    After reviewing the list of windows on the warranty replacement order which Fibertec was going to deliver to Plaintiffs, Dr. Anderson discovered that there were several errors in the list of replacement windows when compared to Plaintiffs' original list of 2011 for the Home.

89.    Among those errors, Dr. Anderson noted that there were at least four (4) windows missing from the shipment.

90.    Dr. Anderson notified Fibertec of their error, and Fibertec agreed to add these windows to the order, however, Fibertec then added a shipping charge of another $1,040 to the bill, claiming the additional fee was a "shipping charge" even though no additional vehicle or shipment was sent and these windows were merely added to the original shipment.

91. In the spring, 2018, when all arrangements for shipping times and unloading of windows at the house were in place, Fibertec required Plaintiffs to wire transfer an additional $6,945.00 for the "shipping".

92. In all, Fibertec had raised the shipping for the warranty replacement windows from $11,800 to $12,845.

93. Fibertec shipped the replacement glass by contracting with Defendant E Ship One.

94. For delivery, Fibertec required that Plaintiffs have a fork lift at the site of unloading, and gave Plaintiffs a time window of 1-2 hours after arrival, within which the windows must be unloaded to avoid additional charges by the shipper.

95. Because Plaintiffs' Home is a residential delivery destination and not a warehouse, Andersons requested a specific time for delivery in order to have a competent fork lift driver and equipment on hand.

96. Andersons were told that the replacement windows left Fibertec on Thursday afternoon, May 17, 2018, and that the drive time would take 12 hours.

97. Defendant E Ship One gave Plaintiffs a delivery date of Monday afternoon, May 21, 2018.

98. Plaintiffs promptly made arrangements to rent a lift and hire the installer to come up from Willmar in order to collect the shipment.

99. After these arrangements were made, Plaintiffs were told that Monday, May 21, 2018, was a Holiday in Ramadan and no one was driving.

15

100.   Plaintiffs were then told that the delivery would arrive on Tuesday morning, May 22, 2018, sometime between 9:00 and 11:00 a.m.

101.   Later that day, the anticipated arrival time date was changed again to "Wednesday afternoon or Thursday morning."

102.   Because the Plaintiffs could not arrange any other lift rental times and needed to hire professionals to unload the windows, Plaintiffs insisted that the delivery be made on Thursday morning, May 24, 2018.

103.   On May 24, 2018, a delivery truck from E Ship One arrived at the Plaintiffs' Home with the new glass for their windows.

104.   The professional glass installer hired by Plaintiffs to unload and install the new windows was immediately struck by the poor packaging and stated to Plaintiffs that he "had never seen sealed glass units packaged and delivered in that way before."

105.   The E Ship One driver watched the unloading and approved of that handling.

106.   Upon opening the shipment, the installer noted that over 15% of the replacement glass sealed units were visibly damaged, that they had been improperly packaged by Fibertec prior to shipment.

107.   The units were protected from one another in the packaging only by small thin cork stick-on pads and had been packaged on wooden pallets instead of steel "L" bucks as Fibertec had promised to Plaintiffs.

16

108. As such, Plaintiffs notified Fibertec immediately of the defective delivery and after an hours discussion with the installer decided to reject the shipment and notified Fibertec of the same.

109. Fibertec demanded that Plaintiffs personally inspect the entire shipment and note and photograph the damage that they saw, and report it back to Fibertec within 24 hours, or, Fibertec threatened, Fibertec would not be responsible for the damage.

110. That same day, the installers hired by Andersons to replace the windows, disassembled one window to put in the replacement glass, and discovered that the fiberglass encasement was severely corroded, damaged, and otherwise defective.

111. Upon information and belief, the original fiberglass encasements for the Andersons' windows from Fibertec are also defective, and may be in part the cause for the failure of the windows.

112. Andersons promptly rejected the entire shipment, and notified Fibertec within 24 hours that the replacement glass, as with the original glass and fiberglass encasements, were defective and rejected in whole.

113. Notwithstanding their rejection of the shipment, Fibertec refused to pay for or collect the rejected shipment, and left the entire shipment in the Andersons' garage.

114. Andersons now learned that in order to obtain clear windows for their Home, it will require removing all of the Fibertec windows and fiberglass encasements, replacing all of the windows in the home, and will require each window to be framed in, damaging the interior and exterior finish of the Home, causing additional expenses.

115.   The original price on the windows according to the 2011 order was $97,738.43 for purchase of the defective Fibertec Windows.

116.   Andersons paid Fibertec an additional $12,845 for shipping of the replacement defective windows, which was rejected.

117.   Upon information and belief, in order to remove and replace all of the defective window units with their defective fiberglass encasements, the cost to the Andersons will exceed $200,000 for parts and labor.

118.   Andersons now have incurred and will continue to incur legal fees and costs in connection with this matter.

119.   Based upon the foregoing, Plaintiffs have suffered direct, consequential and foreseeable damages in an amount in excess of $350,000, along with an additional unliquidated sum in excess of $50,000 to be determined at trial, as well as reasonable attorney fees, costs, and expenses to be collected pursuant to State and Federal Statutes.

## CAUSES OF ACTION

### COUNT I

### VIOLATION OF 15 USC § 2301 *et. seq.*

### (Fibertec, Above and Beyond)

120.   Plaintiffs hereby reallege and incorporate by reference all preceding paragraphs as set forth above.

121.    The Fibertec windows purchased by Plaintiffs are consumer products for purposes of 15 U.S.C. § 2301(1).

122.    Plaintiffs are consumers for purposes of 15 U.S.C. § 2301(2).

123.    Fibertec and Above and Beyond are suppliers and warrantors for purposes 15 U.S.C. § 2301(5).

124.    Defendants sold to Plaintiffs, and Plaintiffs purchased and installed into their house certain Fibertec windows.

125.    Defendants gave to Plaintiffs certain warranties as pleaded below, pursuant to 15 U.S.C. § 2301(6) and (7), which are subject to the provisions of 15 U.S.C. § 2301 *et seq.*

126.    Defendants impermissibly breached those warranties, impermissibly attempted to limit or restrict those warranties, and issued a written warranty that is impermissible and unreasonably limited, and thereby violated the Magnuson Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*

127.    Plaintiffs have suffered direct, consequential and foreseeable damages in an amount in excess of $350,000, along with an additional unliquidated sum in excess of $50,000 to be determined at trial, as well as reasonable attorney fees, costs, and expenses to be collected pursuant to State and Federal Statutes.

## COUNT II

## BREACH OF EXPRESS WARRANTY

### (Above and Beyond, Arlo Cooker)

128.   Plaintiffs hereby reallege and incorporate by reference all preceding paragraphs as set forth above.

129.   Pursuant to Minnesota Statute 336.2-313, Plaintiffs were provided an express warranty of the windows they purchased.

130.   Based upon the direct statements of Cooker on behalf of Fibertec and on behalf of Above and Beyond, Plaintiffs purchased the Fibertec windows and installed the same into their Home.

131.   Those statements as to Fibertec's warranty, and the description of the quality and functionality of the windows made by Cooker created an express warranty.

132.   The windows failed within two years of their installation, and were defective from the start.

133.   Above and Beyond and Arlo Cooker have failed to replace and install the windows with conforming windows at their cost.

134.   Plaintiffs have suffered direct, consequential and foreseeable damages in an amount in excess of $350,000, along with an additional unliquidated sum in excess of $50,000 to be determined at trial, as well as reasonable attorney fees, costs, and expenses to be collected pursuant to State and Federal Statutes.

## COUNT III

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

### (Fibertec, Above and Beyond, Arlo Cooker)

135.    Plaintiffs hereby reallege and incorporate by reference all preceding paragraphs as set forth above.

136.    Pursuant to Minnesota Statute 336.2-314, Plaintiffs were provided an implied warranty of the windows they purchased.

137.    Cooker and Above and Beyond represented themselves to be merchants of residential windows.

138.    Fibertec is a manufacturer and merchant of residential windows.

139.    Plaintiffs purchased $97,738 worth of Fibertec's residential windows from through Above and Beyond, and Cooker.

140.    The windows failed within two years of their installation, and were defective from the start.

141.    Fibertec, Above and Beyond, and Arlo Cooker, have failed to replace and install the windows with conforming windows at their cost.

142.    Such implied warranties may not be disclaimed or modified pursuant to 15 U.S.C. § 2308; 2304(a)(2).

143.    Plaintiffs have suffered direct, consequential and foreseeable damages in an amount in excess of $350,000, along with an additional unliquidated sum in excess of

$50,000 to be determined at trial, as well as reasonable attorney fees, costs, and expenses to be collected pursuant to State and Federal Statutes.

## COUNT IV

## BREACH OF IMPLIED WARRANTY OF

## FITNESS FOR PARTICULAR PURPOSE

### (Fibertec, Above and Beyond, Arlo Cooker)

144.    Plaintiffs hereby reallege and incorporate by reference all preceding paragraphs as set forth above.

145.    Pursuant to Minnesota Statute 336.2-315, Plaintiffs were provided an implied warranty of fitness for a particular purpose of the windows they purchased.

146.    Cooker and Above and Beyond knew and had reason to know that Plaintiffs intended to purchase windows for their residential home for the particular purpose of longevity of the windows, high insulation factor, UV protection, letting solar thermal heat through, and for the fundamental purpose of being able to see through them without clouding or streaks.

147.    Fibertec knew and had reason to know that Plaintiffs, as with any of their customers, intended to purchase windows for their residential home for the particular purpose of longevity of the windows, high insulation factor, UV protection, letting solar

thermal heat through, and for the fundamental purpose of being able to see through them without clouding or streaks, which are advertised benefits of their windows.

148.    Plaintiffs purchased $97,738 worth of Fibertec's residential windows from through Above and Beyond, and Cooker.

149.    The windows failed within two years of their installation, and were defective from the start.

150.    Fibertec, Above and Beyond, and Arlo Cooker, have failed to replace and install the windows with conforming windows at their cost.

151.    Such implied warranties may not be disclaimed or modified pursuant to 15 U.S.C. § 2308; 2304(a)(2).

152.    Plaintiffs have suffered direct, consequential and foreseeable damages in an amount in excess of $350,000, along with an additional unliquidated sum in excess of $50,000 to be determined at trial, as well as reasonable attorney fees, costs, and expenses to be collected pursuant to State and Federal Statutes.


**COUNT IV**

**REJECTION OF DELIVERY, RIGHT TO FULL REPLACEMENT**

**(Fibertec, Above and Beyond, Arlo Cooker, and E Ship One)**


153.    Plaintiffs hereby reallege and incorporate by reference all preceding paragraphs as set forth above.

154.   The federal minimum standard for warranties includes 15 U.S.C. § 2304 which provides that if the product (or a component part thereof) contains a defect or malfunction after a reasonable number of attempts by the warrantor to remedy defects or malfunctions in such product, such warrantor must permit the consumer to elect either a refund for, or replacement without charge of, such product or part (as the case may be). If the warrantor replaces a component part of a consumer product, such replacement shall include installing the part in the product without charge.

155.   Plaintiffs' windows were defective and malfunctioned, and after three years of dealing with Fibertec, Fibertec has been unable to remedy the defects and malfunctions.

156.   Defendants attempted to provide replacement glass, but that replacement glass was damaged upon arrival.

157.   Pursuant to Minnesota Statute 336.2-601, Plaintiffs properly rejected the whole shipment of the purported replacement windows.

158.   Pursuant to 15 U.S.C. § 2304, Plaintiffs have elected to have Fibertec replace at its own cost the entire window assemblies in the Home at Fibertec's cost.

159.   By virtue of Defendants' failure to provide adequate replacements, Plaintiffs have suffered direct, consequential and foreseeable damages in an amount in excess of $350,000, along with an additional unliquidated sum in excess of $50,000 to be determined at trial, as well as reasonable attorney fees, costs, and expenses to be collected pursuant to State and Federal Statutes.

## COUNT V

## VIOLATION OF THE CONSUMER FRAUD ACT

### (Fibertec, Above and Beyond, Arlo Cooker)

160.   Plaintiffs hereby reallege and incorporate by reference all preceding paragraphs as set forth above.

161.   Minn. Stat § 325F.69, subdivision 1 provides: "The act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable as provided in section 325F.70."

162.   By the representations made by Cooker, Above and Beyond, and Fibertec, Defendants represented to Plaintiffs that the Fibertec windows sold to Plaintiffs had the characteristics and benefits as described in detail above, and represented that those goods were of the particular standard, quality, and grade such that they would not fail within three years of installation.

163.   Defendants knew or should have known that the windows installed at the Andersons' Home had failed or were likely to fail.

164.   Upon information and belief, Defendants knew or had reason to know that the windows were not of the advertised quality, and permitted Plaintiffs to purchase the same. Defendants fraudulently withheld the defective nature of the windows, despite

knowing that the windows were defective, until after the expiration of Defendants' purported 2-year warranty.

165.    Defendants intended Plaintiffs to rely on their previous statements of the quality and durability of the windows, and did not inform the Plaintiffs within that 2-year window of the known defect in the Plaintiffs' windows.

166.    Plaintiffs relied on the prior representations of Defendants as to the quality and durability of the windows, and did not discover the defect in the windows until such time as the Defendants could assert their purported 2-year limitation on the warranty coverage.

167.    Cooker and Above and Beyond further made express statements as to the warranty of Fibertec, but withheld the actual terms of the written warranty offered by Fibertec, intending Plaintiffs to rely on the same in their purchase of the Fibertec windows.

168.    Plaintiffs relied on the statements as to the Fibertec warranty.

169.    By virtue of Defendants' violations of Minn.Stat. § 325F.69, Subd. 1, Plaintiffs have suffered direct, consequential and foreseeable damages in an amount in excess of $350,000, along with an additional unliquidated sum in excess of $50,000 to be determined at trial, as well as reasonable attorney fees, costs, and expenses.

## COUNT VI

## DECEPTIVE TRADE PRACTICES

## (Fibertec, Above and Beyond, Arlo Cooker)

170.    Plaintiffs hereby reallege and incorporate by reference all preceding paragraphs as set forth above.

171.    Minn. Stat. § 325D.44, subdivision 1 provides, in part:

> A person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person:
>
> (5) represents that goods have … characteristics [or] … benefits … that they do not have…
> (7) represents that goods are of a particular standard, quality, or grade…if they are of another;

172.    By the representations made by Cooker, Above and Beyond, and Fibertec, Defendants represented to Plaintiffs that the Fibertec windows sold to Plaintiffs had the characteristics and benefits as described in detail above, and represented that those goods were of the particular standard, quality, and grade such that they would not fail within three years of installation.

173.    Upon information and belief, Defendants knew or had reason to know that the windows were not of the advertised quality, and permitted Plaintiffs to purchase the same.

174.    By virtue of Defendants' deceptive trade practices, Plaintiffs have suffered direct, consequential and foreseeable damages in an amount in excess of $350,000, along

with an additional unliquidated sum in excess of $50,000 to be determined at trial, as well as reasonable attorney fees, costs, and expenses.

## COUNT VII

## FRAUD

## (Fibertec, Above and Beyond, Arlo Cooker)

175.   Plaintiffs hereby reallege and incorporate by reference all preceding paragraphs as set forth above.

176.   Defendants knew or should have known that the windows installed at the Andersons' Home had failed or were likely to fail.

177.   Defendants fraudulently withheld the defective nature of the windows, despite knowing that the windows were defective, until after the expiration of Defendants' purported 2-year warranty.

178.   Defendants intended Plaintiffs to rely on their previous statements of the quality and durability of the windows, and did not inform the Plaintiffs within that 2-year period of time of the known defect in the Plaintiffs' windows.

179.   Plaintiffs relied on the prior representations of Defendants as to the quality and durability of the windows, and did not discover the defect in the windows until such time as the Defendants could assert their purported 2-year limitation on the warranty coverage.

180.     Cooker and Above and Beyond further made express statements as to the warranty of Fibertec, but withheld the actual terms of the written warranty offered by Fibertec, intending Plaintiffs to rely on the same in their purchase of the Fibertec windows.

181.     Plaintiffs relied on the statements as to the Fibertec warranty.

182.     By virtue of Defendants' fraud, Plaintiffs have suffered direct, consequential and foreseeable damages in an amount in excess of $350,000, along with an additional unliquidated sum in excess of $50,000 to be determined at trial, as well as reasonable attorney fees, costs, and expenses.

**WHEREFORE**, Plaintiffs herein respectfully pray of this Court for the following relief:

1.     Judgment against Defendants under the Magnuson Moss Warranty Act for the amount in excess of $400,000, pursuant to Count I of this Complaint;

2.     Judgment against Defendants for violations of the Express Warranty in the amount in excess of $400,000, pursuant to Count II of this Complaint;

3.     Judgment against Defendants for violations of the Implied Warranty of Merchantability in the amount in excess of $400,000, pursuant to Count III of this Complaint;

4.  Judgment against Defendants for violations of the Implied Warranty of Fitness for Particular Purpose in the amount in excess of $400,000, pursuant to Count IV of this Complaint;

5.  Judgment against Defendants for violations of the Minnesota Consumer Fraud Act in the amount in excess of $400,000, pursuant to Count V of this Complaint;

6.  Judgment against Defendants for violations of the Minnesota Deceptive Trade Practices Act in the amount in excess of $400,000, pursuant to Count VI of this Complaint;

7.  Judgment against Defendants for fraud in the amount in excess of $400,000, pursuant to Count VII of this Complaint;

8.  Judgment against Defendants awarding Plaintiff its attorney fees, court costs and other costs of collection; and,

9.  For such other, different, and further relief as the Court deems just and equitable.

**PARKER & WENNER, P.A.**

Date: June 15, 2018

/s/ Jordan W. Anderson
Jordan W. Anderson (#391837)
100 South Fifth Street
2100 Fifth Street Towers
Minneapolis, MN 55402-3707
Telephone:   612-355-2200
*Attorneys for Plaintiffs*